SIDLEY AUSTIN LLP
Chelsea McManus (24131499)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:        cmcmanus@sidley.com


SIDLEY AUSTIN LLP
Stephen Hessler (*pro hac vice* pending)
Anthony R. Grossi (*pro hac vice* pending)
Jon W. Muenz (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email:        shessler@sidley.com
              agrossi@sidley.com
              jmuenz@sidley.com

SIDLEY AUSTIN LLP
Jason L. Hufendick (*pro hac vice* pending)
Ryan Fink (*pro hac vice* pending)
Daniela Rakowski (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036
Email:        jhufendick@sidley.com
              ryan.fink@sidley.com
              drakowski@sidley.com

*Proposed Attorneys for the Debtors
and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |
|---|---|
| In re:<br><br>HARVEST SHERWOOD FOOD<br>DISTRIBUTORS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25- 25-80109 (SGJ)<br><br>(Joint Administration Requested) |

---

[1] The debtors in these chapter 11 cases, together with the last four digits of each debtor's federal tax identification number, are Del Mar Holding LLC (9207), Del Mar Acquisition Inc. (8866), Surfliner Holdings, Inc. (9456), Harvest Sherwood Food Distributors, Inc. (8995), Harvest Meat Company, Inc. (9136), LAMCP Capital, LLC (N/A), Western Boxed Meats Distributors, Inc. (8735), Cascade Food Brokers, Inc. (1389), Hamilton Meat, LLC (6917), SFD Acquisition LLC (8995), SFD Transportation Corp. (1551), Sherwood Food Distributors, L.L.C. (4375), and SFD Company LLC (1175).  The Debtors' service address is c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd., Beaverton, OR 97005.

|  |  |
|---|---|
| HARVEST SHERWOOD FOOD DISTRIBUTORS, INC., <br><br> Plaintiff, <br><br> v. <br><br> SPROUTS FARMERS MARKET, INC., SFM, LLC D/B/A SPROUTS FARMERS MARKET, AND JOHN DOE DEFENDANTS 1-200 <br><br> Defendants. | Adv. Pro. No. _____ |

## ADVERSARY COMPLAINT

Plaintiff Harvest Sherwood Food Distributors, Inc. ("Plaintiff" or "Debtor" or "Harvest"), a debtor in the above-captioned chapter 11 cases (together with its affiliated debtors, the "Debtors" and such cases, the "Chapter 11 Cases"), by and through undersigned counsel, respectfully brings this adversary proceeding pursuant to section 544 of title 11 of the United States Code (the "Bankruptcy Code") and rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") against Defendants Sprouts Farmers Market, Inc. and SFM, LLC d/b/a Sprouts Farmers Market ("Sprouts"), as well as 200 John Doe Defendants (together, with Sprouts, the "Defendants") arising out of Sprouts' fraudulent transfers, breach of contract, fraud, and other tortious conduct.[2]  In support of these claims, the Debtor alleges as follows:

---

[2] On February 24, 2025, Debtor filed a Complaint against Sprouts in the Superior Court of the State of Delaware alleging state law contract and tort claims relating to certain of Sprouts' actions alleged herein (the "State Court Proceeding").  *See Harvest Sherwood Food Distributors, Inc. v. Sprouts Farmers Market Inc. and SFM, LLC D/B/A Sprouts Farmers Market*, Case No. N25C-02-494 SKR CCLD (Del. Sup. Ct.).  Given the chapter 11 cases, Debtor is seeking to dismiss the State Court Proceeding without prejudice in order to have those claims consolidated with its core fraudulent transfer claims.

## **NATURE OF THE ACTION**

1.      This adversary proceeding concerns Sprouts' flagrant breach of contract and fraudulent transfers of funds owed to Harvest.  At the time of the breach and transfers, Sprouts leveraged Harvest's financial distress to its own benefit, which was a significant catalyst to Harvest's decision to winddown its operations and commence these Chapter 11 Cases.

2.      Founded in 1989 with a focus on supplying high-quality products to independent food companies, Harvest is now insolvent.  While Harvest's financial circumstances are the result of several factors, Harvest's business suffered a fatal blow when its largest customer—Sprouts—communicated to Harvest that it would transition largely to self-distribution.

3.      While Sprouts' transition to self-distribution was disastrous for Harvest's business, this adversary proceeding does not directly concern that transition.  Rather, this proceeding concerns Sprouts' scheme to benefit from Harvest's vulnerability and profit at its expense.

4.       Harvest and Sprouts' long-standing business relationship was not governed by a master contract.  Rather, Sprouts would place orders with Harvest for certain food products, which Harvest would then purchase from vendors and deliver to Sprouts' stores, six days a week.  Under the Parties' arrangement, Sprouts would pay Harvest on a biweekly basis for the costs of the goods plus a service fee.

5.      With explicit awareness of Harvest's precarious financial position—largely a result of Sprouts' own actions—Sprouts informed Harvest that it would stop paying the full amount of money that it owed to Harvest for goods that Harvest had shipped to Sprouts' stores or that Harvest was holding for later shipment.  Rather, Sprouts started to "bifurcate" such payments, with most of the funds going to third-party vendors with whom Sprouts claims to have relationships.  In other

words, Sprouts transferred funds rightfully belonging to Harvest to third parties knowing full well that Harvest was at risk of insolvency.

6.       In response to Sprouts' wrongful actions, Harvest stopped its distribution to Sprouts' stores.  This brought Sprouts to the negotiating table.  After arm's-length negotiations between the parties, Sprouts entered into a written contract whereby it would provide Harvest specific scheduled payments of desperately needed funds—funds that Sprouts *already owed to Harvest*—if Harvest agreed to ship certain products to Sprouts.  After Harvest shipped millions of dollars' worth of products over a holiday weekend, Sprouts claimed to be "validating" and "reconciling" amounts owed, but evidently had no intention of paying another dime.  Instead, Sprouts, which has vast resources and a market capitalization approaching $17 billion, had its lawyers send a letter to Harvest alleging that it had only agreed to pay Harvest under "duress" and would not provide the remaining funds that it owed to Harvest.

7.       Sprouts promptly followed up with an "offer" to buy out Harvest's remaining inventory at 20 cents on the dollar.

8.       Sprouts knew all along that Sprouts would never hold up its end of the bargain. Sprouts knew that Harvest, in its desperation for funding, would "make the first move" and ship its product before receiving full payment.  The only "duress" in this situation is that imposed by Sprouts upon Harvest.

9.       Harvest seeks by this adversary proceeding to redress the harm caused by Sprouts by recovering the funds fraudulently transferred to third parties and requiring Sprouts to pay what it otherwise owes Harvest pursuant to their agreement.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334 because this is a civil proceeding arising in or related to the Debtors' Chapter 11 Cases under the Bankruptcy Code.

11.     The matters set forth herein are core proceedings pursuant to 28 U.S.C. § 157(b)(2) and the Court may enter final orders for matters contained herein.

12.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

13.     Plaintiff Harvest is a Delaware corporation formerly with its principal place of business in Detroit, Michigan.  As of the date hereof, Plaintiff Harvest's only remaining physical operations are located in Dallas, Texas.  Harvest marketed and distributed a variety of perishable food products across the country through over a dozen distribution centers and sales offices, which serviced over 6,000 retail, foodservice, distribution, and manufacturing customers.

14.     Defendant Sprouts Farmers Market, Inc. is a Delaware corporation with its principal place of business in Phoenix, Arizona.  Sprouts is a publicly-traded supermarket chain that recently reported 2024 sales revenue exceeding $7 billion.

15.     Defendant SFM, LLC d/b/a Sprouts Farmers Market is a Delaware LLC and is an affiliated operating subsidiary of Sprouts Farmers Market, Inc.

## FACTS

### A.     The Relationship Between Harvest and Sprouts

16.     For many years, Harvest served as Sprouts' meat and seafood distributor.  As is customary in the industry, the parties' relationship was not governed by a master contract.  Rather,

Sprouts generally placed orders with Harvest for food products; Harvest then acquired the products from various vendors and distributed them to Sprouts' retail stores.

17.    Under the parties' long-standing business relationship, Sprouts agreed to pay Harvest for its cost of goods plus a fee for its services.

18.    Sprouts did not have any direct relationship with the vendors from whom Harvest procured goods and was not obligated to pay them for goods ordered by Harvest.

19.    Sprouts and Harvest did not have any agreement with respect to how Harvest must use any payment received from Sprouts.

**B.    Harvest's Financial Distress**

20.    Harvest recently has faced operational headwinds relating to shifting market dynamics, rising operational costs, and changing consumer preferences.  These challenges put a strain on the company's liquidity and forced it to explore various sale, turnaround, and refinancing scenarios.

21.    In light of its financial challenges, Harvest ran a marketing process and began to evaluate strategic options.  Harvest also retained financial and turnaround advisory firms, including Ankura Consulting Group, LLC ("Ankura") and Hilco Commercial Industrial, LLC and Hilco Receivables, LLC (collectively, "Hilco"), to help manage its business and to communicate on its behalf with certain counterparties, including Sprouts.

22.    Unfortunately, amid its marketing process, Harvest's challenges increased dramatically when, in December 2024, Sprouts, the company's largest customer, communicated an intent to migrate to a full self-distribution model for a variety of its product categories across its network.

23.    Harvest's financial distress was amplified further when, on January 27, 2025,

Harvest was downgraded from "Recommended" to "Cautionary" by Seafax, a credit reporting agency.  The downgrading had an immediate impact on Harvest's customer and vendor base and further strained the company's liquidity.  In particular, Harvest lacked the liquidity to make scheduled payments to certain vendors, including vendors who had supplied products for distribution to Sprouts' stores.

24.    Sprouts knew about Harvest's financial distress and saw an opportunity to capitalize on it.

**C.    Sprouts Improperly Transfers Funds Owed to Harvest**

25.    On February 5, 2025, Joseph Hurley, Sprouts' chief supply chain officer, wrote to Karl Berger, Harvest's then-CEO, that Sprouts was "concerned" about Harvest's "ability to pay" vendors and that, "effective immediately, Sprouts will begin bifurcating payments of amounts due to Harvest to pay (1) vendors directly for their products and (2) Harvest only for its costs and margin on those products above product costs."  Mr. Hurley stated that Sprouts "will continue to do so until Harvest is able to demonstrate to our satisfaction that it has the financial means to timely pay outstanding amounts to its vendors."  Exhibit A.

26.    Sprouts had no contractual right to "bifurcate" or otherwise withhold payments in this manner, nor did it have a right to transfer to vendors funds that were owed to Harvest.

27.    At the time, Harvest's lenders had noticed a default under Harvest's credit facility agreement and the funds owed to Harvest by Sprouts were needed to fulfill payments to Harvest's lenders.  Sprouts was well aware that Harvest had substantial debt obligations.

28.    Harvest had continued providing the distribution needs of Sprouts, its largest customer, throughout Harvest's financial problems.  Indeed, Harvest continued distributing goods to Sprouts following Harvest's default under its credit-facility agreement, as Harvest knew the

Sprouts accounts receivable were valuable revenue.  Under the Parties' business relationship, Harvest would make near-daily deliveries to Sprouts locations, with payment to be made on 14-day terms.  Harvest transferred these goods to Sprouts despite being insolvent because, based on the Parties' long-standing business relationship, Harvest expected to receive equivalent value in cash from Sprouts for its services.

29.     At the time, Sprouts already owed Harvest approximately $55 million related to products previously delivered by Harvest to Sprouts' stores.  Sprouts was aware that Harvest was in financial distress, and that Sprouts' bifurcation of payments would further hinder Harvest's ability to meet its obligations to its creditors.  Indeed, Sprouts intended to benefit the vendors with whom it continued to conduct business at the expense of Harvest's creditors.

30.     On February 6, 2025, Mr. Berger responded that Harvest was aware of outreach by vendors and that it was "working with our lenders and other key parties on next steps."  Mr. Berger made clear, however, that Harvest "does not agree with [Sprouts'] approach and reserves all its rights with respect to amounts owed by Sprouts to Harvest."  Mr. Berger further clarified that "[a]ny amounts that Sprouts decides to pay directly to vendors does not reduce or otherwise offset its obligations to Harvest."  Exhibit A.

31.     On February 7, 2025, Mr. Hurley further responded without any basis or support that "[t]he funds that Sprouts has historically paid to Harvest are earmarked for the vendors" and "are effectively pass-through funds."  Mr. Hurley asserted that Sprouts is "entitled to protect its interests and pay the vendors directly . . . to ensure the continued supply of product to our stores."  Mr. Hurley stated that Sprouts would "continue to make separate payments to our vendors and Harvest in this manner until Harvest is able to provide us with reasonable assurance that it has the financial means to fulfill orders and timely pay outstanding amounts to its vendors."  Exhibit A.

32.    Sprouts made good on its threat and withheld its next scheduled payment to Harvest, thereby preventing Harvest from making the very payments upon which Sprouts insisted and further hindering Harvest's ability to pay its creditors. Sprouts' actions also deprived of necessary capital it needed to continue operating.

33.    On February 7, 2025, Sprouts bifurcated payment of the $15 million it owed Harvest for the previous term's deliveries, paying Harvest only 8% (or approximately $1.2 million) of what it owed.[3] Additionally, Sprouts already owed $55 million related to products previously delivered by Harvest to Sprouts' stores.

34.    Despite its insolvency, Harvest had continued providing goods to Sprouts based on the expectation that it would receive equivalent value in cash for such goods. But Sprouts was paying Harvest a fraction of what it owed, causing Harvest significantly greater financial distress and depriving it of reasonably equivalent value for the goods and services it provided.

**D.    Sprouts and Harvest Reach an Agreement**

35.    In light of Sprouts' refusal to pay amounts owed to Harvest, Harvest halted its shipments of products to Sprouts' stores.

36.    On February 11, 2025, Harvest and Sprouts reached an agreement (the "Agreement") whereby, through February 22, 2025, Harvest would ship inventory on a daily basis and Sprouts would pay the approximately $55 million of outstanding accounts receivable as well as cash on delivery for additional shipments.

37.    The Agreement, which was discussed by telephone and then confirmed in a series of emails dated February 11, 2025 between various Sprouts and Harvest representatives, including, among others, Brandon Lombardi, Sprouts' Chief Legal Officer, and Andrew Scriven of Ankura,

---

[3] The identity of the vendors to whom Sprouts made the diverted payments (the "Vendor Transferees") is not yet known to Harvest and will be ascertained in discovery.

which is attached hereto as Exhibit B, summarily provided for the following delivery and payment schedule:

| Week | Terms |
|---|---|
| **Week Ending 2/15** | • 2/11: $15.0M once deliveries confirmed by Sprouts<br>• 2/12: $7.50M + shipment amount (invoice for product delivered)<br>• 2/13: $3.75M + shipment amount (invoice for product delivered)<br>• 2/14: $3.75M + shipment amount (invoice for product delivered)<br>• 2/15: shipment amount (invoice for product delivered)<br>• **Total: $30.00M + shipments** |
| **Week Ending 2/22** | • 2/17: $5.50M + shipment amount (invoice for product delivered)<br>• 2/18: $5.50M + shipment amount (invoice for product delivered)<br>• 2/19: $5.50M + shipment amount (invoice for product delivered)<br>• 2/20: $5.50M + shipment amount (invoice for product delivered)<br>• 2/21: $3.00M + shipment amount (invoice for product delivered)<br>• 2/22: shipment amount (invoice for product delivered)<br>• **Total: $25.00M + shipments** |

## E.    Sprouts Initially Performs In Order To Induce Harvest To Deliver

38.    Unbeknownst to Harvest, Sprouts sought to induce Harvest into shipping additional products while never intending to comply with its payment obligations under the Agreement.

39.    On February 11, 2025, Nick Konat, Sprouts' president and chief operating officer, stated by email that "[o]nce we have confirmation that stores have received their deliveries tomorrow – we will wire the agreed upon payment."  Exhibit B.

40.    On February 12, 2025, representatives of Sprouts spoke with Hilco, which assured Sprouts that Harvest would be able to service all existing inventory during the two-week duration of the Agreement.  That same day, Sprouts made an initial $25 million payment to Harvest under the Agreement.  *See* Exhibit C.

41.    On February 13, 2025, Buddy Beaman of Hilco emailed Mr. Konat and others at Sprouts with thanks for Sprouts' "continued commitment to making payments as scheduled." Mr. Beaman advised that, "[a]s we progress with this arrangement, we've developed a plan to

reconcile each day's delivery," including that "[s]tarting tomorrow, we will provide you with the actual figures for the previous day and the estimated numbers for the current day by noon," with the goal being "to reconcile the previous day's numbers and adjust the current day's payment by the difference." *See* Exhibit C.

42.     Curtis Valentine, Sprouts' chief financial officer, confirmed Sprouts' agreement to Hilco's proposed process, responding that Hilco should "send the details . . . and we'll make the internal connections to align on the daily reconciliations." *See* Exhibit C.  That same day, Sprouts paid Harvest an additional $6.25 million.  *See* Exhibit C.

43.     On February 14, 2025, Hilco sent Sprouts the agreed reconciliation figures. *See* Exhibit D.  Sprouts paid Harvest an additional $6.25 million, bringing its total payments to $37,500,000.  At this point, Sprouts began to implement its pre-planned breach of the Agreement.

**F.      Sprouts Reneges On The Agreement**

44.     On February 14, 2025, Mr. Konat of Sprouts contacted Mr. Scriven of Ankura by telephone to express Sprouts' purported concern that it was receiving non-Sprouts inventory in Harvest's deliveries and generally receiving more product than expected.  Mr. Konat did not provide any information or data to substantiate its claims.  Harvest immediately confirmed that all items shipped had indeed been Sprouts items.  Moreover, Sprouts' complaint about receipt of a large volume of product was confusing given that Sprouts had instructed Harvest to ship as much product into their stores as possible due to concerns about Harvest's future operational capacities.

45.     The following Monday, February 17, 2025, was a bank holiday and Harvest had concerns about continuing to ship inventory to Sprouts over the weekend without being paid for it.  Nonetheless, Harvest performed as scheduled under the Agreement.  On February 17, 2025, Mr. Beaman of Hilco emailed Mr. Konat of Sprouts to state that "shipments have gone out for

Wednesday through Saturday without any reconciliations being processed." *See* Exhibit E. Mr. Beaman advised that "[s]hipping will continue today, but we need your team to catch up on the outstanding reconciliation numbers" and offered to schedule a call to discuss.

46.    Mr. Konat responded that same day: "Thanks for the note. We're working through the reconciliations for last week's shipments but need a bit more time to validate the amounts. We should be in a decent place by tomorrow afternoon. Would you like to set up a time for a call to talk through early afternoon?" Exhibit E. This response was a lie; Sprouts was not "working through the reconciliations" and in fact had no intention of making any additional payments to Harvest, but rather only inducing Harvest to continue to ship.

47.    On February 18, 2025, Sprouts had its lawyers send a letter to Harvest asserting that Sprouts had entered into the Agreement under "duress" and purporting to rescind and/or terminate the Agreement. Sprouts did not offer to return any of the millions of dollars of goods that it had received pursuant to the Agreement.

48.    Immediately after sending the "duress" letter, Mr. Konat of Sprouts promptly canceled the telephone call to discuss "validating" amounts owed to Harvest. Exhibit F. At the same time, Mr. Konat betrayed Sprouts' true motivations by stating that "if there is inventory remaining in your [distribution centers] that you'd like us to discuss a different arrangement for us [to] acquire at a lower cost, let us know." *Id.*

49.    On February 19, 2025, Mr. Konat of Sprouts offered in a telephone call to purchase all remaining inventory at 20 cents on the dollar. Eric Kaup of Hilco declined on behalf of Harvest.

50.    On February 20, 2025, Harvest announced that it was ceasing operations and liquidating its assets.

51.    On May 5, 2025, the Debtors commenced these Chapter 11 Cases (the "Petition

<u>Date</u>").

52.    Under the terms of the Agreement, Harvest shipped to Sprouts from February 12, 2025, through and including February 17, 2025.  Sprouts has not made a payment to Harvest since February 14, 2025.

53.    Sprouts owes Harvest at least $41.8 million arising from prior Sprouts purchase orders and the Agreement.  Sprouts also owes additional amounts yet to be determined based on additional inventory held by Harvest for which Sprouts agreed to pay.

## CLAIMS FOR RELIEF

### COUNT I
### ACTUAL FRAUDULENT TRANSFERS
### (11 U.S.C. §§ 544(b), 548(a)(1)(A))

54.    Harvest hereby re-alleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

55.    Beginning on February 5, 2025 and continuing through an unknown date, Sprouts caused the Debtor's property to be transferred to third parties for the benefit of Sprouts and those third parties.

56.    Harvest had an ownership interest in funds that were the subject of each of the transfers pursuant to its contractual relationship with Sprouts.

57.    Sprouts had no contractual or other legal right to make the transfers.

58.    The transfers occurred within two years of the Petition Date.

59.    The transfers were made with the actual intent to hinder, delay, or defraud Harvest's creditors.  Badges of fraud evidencing such intent include, but are not limited to:

       a.    Harvest was insolvent, or on the brink of insolvency, when the transfers were made, and Sprouts knew of that condition through direct communications with Harvest's management and representatives;

b. The transfers were made after Harvest was in default to its lenders, which likewise was known to Sprouts – indeed, Harvest's financial distress was an express basis for Sprouts' "bifurcation" of payments;

c. The transfers diverted monies needed for Harvest to service its senior debt, thereby stripping the estate of liquidity and frustrating creditor recoveries;

d. Sprouts informed Harvest that it would withhold or reroute funds "effective immediately" because it knew that Harvest was insolvent or on the brink of insolvency and sought to place the funds beyond the reach of Harvest's creditors; and

e. Harvest did not benefit from the transfers; instead, the transfers benefitted Sprouts by ensuring uninterrupted product flow to its stores and benefiting third parties with whom Sprouts had ongoing business relationships, while shifting the risk of non-payment entirely onto Harvest and its creditors.

60.    The foregoing transfers are avoidable under 11 U.S.C. § 548(a)(1)(A).

61.    Pursuant to 11 U.S.C. § 550(a), Plaintiff is entitled to recover, for the benefit of the estate, the value of the foregoing transfers, together with prejudgment interest, attorneys' fees, and costs to the extent permitted by law.

## COUNT II
## CONSTRUCTIVE FRAUDULENT TRANSFERS
## (11 U.S.C. §§ 544(b), 548(a)(1)(B))
### (*In the Alternative*)

62.    Harvest hereby re-alleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

63.    Within two years of the Petition Date and while insolvent or on the brink of insolvency (i) Harvest transferred goods to Sprouts and (ii) Sprouts transferred funds belonging to

Harvest to third party vendors.

64.     Harvest did not receive reasonably equivalent value in exchange for either of the foregoing transfers because:

      a.  Harvest did not receive payment for the goods that it transferred to Sprouts, but rather such payment was diverted to third parties;

      b.  Sprouts owed Harvest the full amount for the transferred goods;

      c.  Sprouts had no right to offset or divert funds to the third party vendors; and

      d.  Harvest did not obtain any benefit from the transfers and the diversion of funds deprived Harvest of liquidity critical to the repayment of its debts.

65.     The transfers are avoidable under 11 U.S.C. § 548(a)(1)(B).

66.     Pursuant to 11 U.S.C. § 550(a), Plaintiff is entitled to recover, for the benefit of the estate, the value of the transfers, together with prejudgment interest, attorneys' fees, and costs to the extent permitted by law.

## COUNT III
## TURNOVER OF PROPERTY OF THE ESTATE
### (11 U.S.C. § 542)
### (*Against John Doe Defendants 1-200*)

67.     Harvest hereby re-alleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

68.     Upon information and belief, some or all of the funds that Sprouts fraudulently transferred from Harvest were remitted to one or more Vendor Transferees (collectively, the "John Doe Defendants"), the names of whom are presently unknown to Harvest.  Harvest will seek leave to amend this Complaint to substitute the names of the John Doe Defendants when they have been ascertained through discovery.

69.     The funds transferred to the John Doe Defendants were proceeds of accounts

receivable and/or other property in which Harvest held a legal or equitable interest, and therefore constitute property of the Debtors' estate within the meaning of 11 U.S.C. § 541(a).

70.     The John Doe Defendants are entities that are in possession, custody, or control of estate property (or the proceeds, products, offspring, rents, or profits of such property) of consequential value to the Debtors' estate.

71.     Pursuant to 11 U.S.C. § 542(a), each of the John Doe Defendants, absent a valid defense under the Bankruptcy Code, is obligated to deliver to Harvest and account for all property of the estate (or the value of such property) that is in its possession, custody, or control.

**COUNT IV**
**BREACH OF CONTRACT**

72.     Harvest hereby re-alleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

73.     Harvest and Sprouts entered into a series of valid and binding agreements through which Sprouts agreed to order and Harvest agreed to procure and deliver goods to Sprouts' stores.

74.     Harvest performed under the agreements by procuring and delivering goods to Sprouts' stores.

75.     Sprouts breached those agreements by failing to pay amounts due and owing under the agreements.

76.     Harvest has suffered damages as a result of Sprouts' breaches.

77.     Harvest and Sprouts entered into a separate agreement—the Agreement referenced above—under which Harvest would ship inventory on a daily basis and Sprouts would pay approximately $55 million of outstanding accounts receivable as well as cash on delivery for additional shipments.  The total amount owed and unpaid by Sprouts under the Agreement is $41.8 million.

78.     Harvest has performed its obligations under the Agreement by shipping inventory to Sprouts.

79.     Sprouts breached the Agreement by failing to pay the remaining amount owed under the Agreement.

80.     Harvest has suffered damages as a result of Sprouts' breach.

## COUNT V
## PROMISSORY ESTOPPEL
### (*In the Alternative*)

81.     Harvest hereby re-alleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

82.     Sprouts promised to pay Harvest for outstanding accounts receivable and amounts owed for additional shipments.

83.     Sprouts made such promise with the reasonable expectation of inducing Harvest to deliver products to Sprouts' stores.

84.     Harvest reasonably relied on Sprouts' promise and took action to its detriment.

85.     Sprouts should be bound to its promise because injustice can be avoided only by enforcement of the promise.

## COUNT VI
## FRAUD

86.     Harvest hereby re-alleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

87.     Sprouts represented to Harvest that it would pay approximately $55 million of outstanding accounts receivable as well as cash on delivery for additional shipments made on a daily basis by Harvest as of February 11, 2025.

88.     Sprouts' representation was false when made, without any intention to perform, and

only to induce Harvest to deliver products to Sprouts' stores.  Sprouts further misrepresented to Harvest that it needed time to "validate" amounts owed and "work[] through the reconciliations," when in fact it was not taking either action but rather had no intention of making further payments to Harvest.

89.    Harvest reasonably relied on Sprouts' misrepresentations to its detriment and damages in the amount of at least $41.8 million.

**COUNT VII**
**QUASI-CONTRACT/UNJUST ENRICHMENT**
(***In the Alternative***)

90.    Harvest hereby re-alleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

91.    Sprouts has been enriched by receipt of goods delivered by Harvest.

92.    Harvest provided the goods to Sprouts with the expectation that Sprout would pay for them.

93.    Harvest has been impoverished by not receiving just compensation for the goods delivered.

94.    Sprouts has no valid justification for failing to pay amounts that it agreed to pay in exchange for the goods that Harvest delivered and should have known Harvest expected to be paid.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

A.  On Count I, pursuant to §§ 548(a)(1)(A) and 550 of the Bankruptcy Code, enter judgment (a) avoiding the fraudulent transfers; and (b) to recover the fraudulent transfers, or the value thereof, against Sprouts in an amount to be determined at trial;

B.  On Count II, pursuant to §§ 548(a)(1)(B) and 550 of the Bankruptcy Code, enter judgment

(a) avoiding the fraudulent transfers; and (b) to recover the fraudulent transfers, or the value thereof, against Sprouts in an amount to be determined at trial;

C.  On Count III, pursuant to 11 U.S.C. §§ 542(a) and 550 of the Bankruptcy Code, enter judgment directing each John Doe Defendant to turn over to Harvest all estate property in its possession, custody, or control (including, without limitation, all funds transferred by Sprouts that are property of the estate), or, in the alternative, to pay Harvest the cash value of such property;

D.  On Counts IV through VII:

  a.  Enter judgment in its favor and against Defendants on all claims alleged in this complaint;

  b.  Award Plaintiff actual damages in an amount to be proven at trial, but not less than $41.8 million;

  c.  Impose punitive damages on Defendants;

  d.  Award Plaintiff prejudgment and post-judgment interest; plus costs including attorneys' fees; and

  e.  All further relief to which Plaintiff may be found entitled.

Dated:  May 8, 2025
Dallas, Texas

*/s/ Chelsea McManus*

**SIDLEY AUSTIN LLP**
Chelsea McManus (24131499)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:        cmcmanus@sidley.com

*and*

Stephen Hessler (*pro hac vice* pending)
Anthony R. Grossi (*pro hac vice* pending)
Jon Muenz (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email:        shessler@sidley.com
              agrossi@sidley.com
              jmuenz@sidley.com

*and*

Jason L. Hufendick (*pro hac vice* pending)
Ryan Fink (*pro hac vice* pending)
Daniela Rakowski (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036
Email:        jhufendick@sidley.com
              ryan.fink@sidley.com
              drakowski@sidley.com

*Proposed Attorneys for the Debtors
and Debtors in Possession*

## **Certificate of Service**

I certify that on May 8, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

/s/ Chelsea McManus
Chelsea McManus